United States Courts
Southern District of Texas
FILED

OCT – 4 2017

David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

UNITED STATES OF AMERICA     .
       .
v.                   .     CRIMINAL NO. 3:16-cr-017-1
       .
DEADRIAN QUINCY MORRISON,     .
**Defendant.**               .

## PLEA AGREEMENT

The United States of America, by and through Abe Martinez, Acting United States Attorney for the Southern District of Texas, and Sherri L.Zack, Assistant United States Attorney, and the defendant, Deadrian Quincy Morrison ("Defendant"), and Defendant=s counsel, pursuant to Rule **11(c)(1)(A)** of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Count[s] One, Two, Five and Six of the Indictment. Count One charges Defendant with **Conspiracy to Commit Sex** Trafficking, in violation of Title 18, United States Code, Section 1594(c), 1591(a)(1), (a)(2), and (b)(2). Counts Two, Five and Six charge Defendant with **Sex Trafficking of Minors**, in violation of Title 18, United States Code, Section 1591(a), (b)(2) and 2. Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

### Punishment Range

2. The **statutory** maximum penalty for each violation of Title 18, United States Code, Section 1594(c), is imprisonment of any term of years up to Life and a fine of not more than $250,000. Additionally, Defendant may receive a term of supervised release after imprisonment

of at least five years and up to Life. *See* Title 18, United States Code, sections 3559(a)(3) and 3583(b)(2). The **statutory** maximum penalty for each violation of Title 18, United States Code, 1591(a), (b)(2) and 2, is imprisonment for no less than ten years up to Life and a fine of not more than $250,000. Defendant acknowledges and understands that if he/she should violate the conditions of any period of supervised release which may be imposed as part of his/her sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, sections 3559(a)(3) and 3583(e)(3). Defendant understands that he/she cannot have the imposition or execution of the sentence suspended, nor is he/she eligible for parole.

3.      Defendant understands that under the Sex Offender Registration and Notification Act, the Defendant must register and keep such information current in the jurisdictions where the Defendant resides, is employed, and is a student. The Defendant further understands that the requirement to keep the registration current includes informing such jurisdictions not later than three (3) business days after any change of the Defendant's name, residence, employment or student status. The Defendant understands that failure to comply with these obligations subjects the Defendant to prosecution for failure to register under federal law, specifically, Title 18, United States Code, Section 2250, as well as applicable state statutes.

### Mandatory Special Assessment

4.   Pursuant to Title 18, United States Code, section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction.   The payment will be by

cashier=s check or money order, payable to the Clerk of the United States District Court, c/o District Clerk=s Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

5.   Pursuant to Title 18, United States Code, Section 3014(a)(3), if the court determines that the Defendant is a non-indigent person, the Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of five thousand dollars ($5000.00) per count of conviction.   The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District clerk's Office, P.O. Box 61010, Houston, TX 77208, Attention: Finance.

## Immigration Consequences

6.   Defendant recognizes that pleading guilty may have consequences with respect to his/her immigration status if he/she is not a citizen of the United States. Defendant understands that if he/she is not a citizen of the United States, by pleading guilty he/she may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty.

## Cooperation

7.   The parties understand this agreement carries the potential for a motion for departure under Section 5K1.1 of the Sentencing Guidelines. Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the United States Attorney for the Southern District of Texas.   Should Defendant=s cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the United States

Sentencing Guidelines. Defendant further agrees to persist in that plea through sentencing, fully cooperate with the United States, not oppose the forfeiture of assets contemplated in paragraph 24 of this agreement. Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

8.   Defendant understands and agrees that "fully cooperate," as that term is used herein, includes providing all information relating to any criminal activity known to Defendant, including but not limited to sex trafficking of minors. Defendant understands that such information includes both state and federal offenses arising therefrom.   In that regard:

(a)   Defendant agrees that this plea agreement binds only the United States Attorney for the Southern District of Texas and Defendant; it does not bind any other United States Attorney or any other unit of the Department of Justice;

(b)   Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States. Defendant further agrees to waive his/her Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c)   Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)   Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)   Defendant agrees to provide to the United States all documents in his/her possession or under his/her control relating to all areas of inquiry and investigation; and

(f)   Should the recommended departure, if any, not meet Defendant=s expectations, the Defendant understands that he/she remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his/her plea.

### Waiver of Appeal and Collateral Review

9.   Defendant is aware that Title 28, United States Code, section 1291, and Title 18, United States Code, section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

10.   In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he/she may have received from his counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce his/her guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing

Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

11.     Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

12.   The United States agrees to each of the following:

(a)     If Defendant pleads guilty to Counts 1,2,5 and 6 of the indictment and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will move to dismiss any remaining counts of the indictment at the time of sentencing;

(b)     If the Court determines that Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines, and the offense level prior to operation of section 3E1.1(a) is 16 or greater, the United States will move under section 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his or her intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

## Agreement Binding - Southern District of Texas Only

13.   The United States Attorney's Office for the Southern District of Texas agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the indictment. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant. It does not bind any other United States Attorney's Office. The United States Attorney's Office for the Southern District of Texas will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

**United States' Non-Waiver of Appeal**

14.   The United States reserves the right to carry out its responsibilities under guidelines sentencing.   Specifically, the United States reserves the right:

(a)   to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office=s preparation of a presentence report;

(b)   to set forth or dispute sentencing factors or facts material to sentencing;

(c)   to seek resolution of such factors or facts in conference with Defendant=s counsel and the Probation Office;

(d)   to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

(e)   to appeal the sentence imposed or the manner in which it was determined.

**Sentence Determination**

15.   Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences

7

imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and

will remain bound to fulfill all of the obligations under this plea agreement.

## Rights at Trial

16. Defendant understands that by entering into this agreement, he/she surrenders certain

rights as provided in this plea agreement. Defendant understands that the rights of a defendant

include the following:

(a) If Defendant persisted in a plea of not guilty to the charges, defendant would
have the right to a speedy jury trial with the assistance of counsel. The trial may
be conducted by a judge sitting without a jury if Defendant, the United States, and
the court all agree.

(b) At a trial, the United States would be required to present witnesses and other
evidence against Defendant. Defendant would have the opportunity to confront
those witnesses and his/her attorney would be allowed to cross-examine them. In
turn, Defendant could, but would not be required to, present witnesses and other
evidence on his/her own behalf. If the witnesses for Defendant would not appear
voluntarily, he/she could require their attendance through the subpoena power of
the court; and

(c) At a trial, Defendant could rely on a privilege against self-incrimination and
decline to testify, and no inference of guilt could be drawn from such refusal to
testify. However, if Defendant desired to do so, he/she could testify on his/her
own behalf.

## Factual Basis for Guilty Plea

17. Defendant is pleading guilty because he/she is in fact guilty of the charges contained

in Count(s) One, Two, Five and Six of the indictment. If this case were to proceed to trial, the

United States could prove each element of the offense beyond a reasonable doubt. The following

facts, among others would be offered to establish Defendant's guilt:

Defendant, DEADRIAN QUINCY MORRISON is a, "PIMP", and part of a sex trafficking

organization where MORRISON profited from the prostitution of adult and minor females in the

Brazoria and Matagorda County areas. MORRISON is also an EASTSIDE GORILLAS criminal street gang member that distributes marihuana and prescription Xanax. Working directly with MORRISON is PATRICIA MADISON COPE, who is a prostitute, recruiter and trainer. COPE recruited three minor females in May of 2016, trained them in prostitution and collected earnings from the minors for "licks". COPE gave all proceeds earned from the commercial sex to MORRISON. MORRISON provided transportation, money for hotel rooms, condoms, food and drugs to the victims. MORRISON would motivate and control prostitutes through fear by means of verbal threats and physical assaults. MORRISON'S own motivation is status and ultimately, money. MORRISON monitored COPE'S activities by setting up COPE'S TextNow account on his phone. COPE, in turn, set up the TextNow account used by three minor female victims on her phone to monitor their "licks". Licks are what prostitution dates or commercial sex acts are called by persons involved in the commercial sex trade.

On August 26, 2016, MORRISON was stopped and arrested in Lake Jackson, Brazoria County, Texas by Texas DPS Trooper Strawn for Possession of Marihuana and Possession of a Controlled Substance. TFO Arizmendi seized MORRISON'S silver Apple iPhone 6 plus model A1522 cell phone following the traffic stop. On August 27, 2016, FBI Special Agent (SA) Richard Rennison obtained a search warrant for the contents of MORRISON'S cell phone.

On August 29, 2016, FBI Task Force Officer (TFO) Aaron Arizmendi conducted an Advanced Logical extraction of MORRISON'S phone which contained evidence of MORRISON'S participation in child sex trafficking, transportation of minors and drug distribution.

On July 5, 2016, COPE was arrested by the Lake Jackson Police Department (LJPD) for Compelling Prostitution. On July 15, 2016, COPE reported to FBI Special Agent (SA) Richard

Rennison and Lake Jackson Police Department Detective Jimenez that COPE worked for MORRISON as a prostitute. COPE'S criminal affiliation with MORRISON was confirmed by Minor Victim 3 (MV3), Minor Victim 2 (MV2), Minor Victim 1 (MV1), and others. COPE reported she used a TextNow app to communicate with the "Johns", also referred to as "licks". COPE said the account was under username Caylan Smith and had assigned phone number 979-559-9158. COPE reported that MORRISON had COPE'S TextNow account set up on his phone so he could monitor her prostitution activities. TFO Arizmendi found TextNow account for Caylan Smith in the extraction from MORRISON'S phone.

On or around May 20, 2016, three minor females, MV1, MV2 and MV3, contacted COPE for the purpose of getting into prostitution. MV2 and MV3 knew COPE from school and were aware that she made money prostituting. COPE agreed to help them.  MV1, MV2 and MV3 met COPE at the Super 8 in Lake Jackson. COPE instructed them on how to be a prostitute. COPE told them an "in-call" is when the men come to you and an "out-call is when you go to the men. COPE told them that she charged $150 for an hour and $100 for a half hour. COPE told them that having sex with the man for money was called a "lick".

COPE told them to download an app on their phone called "TextNow." MV3 download the TextNow app on her phone and used the email address alyssanicole420@yahoo.com for her account.

To get "licks", COPE told them that you use the website Backpage.com to post advertisements for prostitution dates. On September 15, 2016, MV3 told SA Rennison and TFO Arizmendi she created a Backpage account using the email alyssanicole420@yahoo.com and posted an advertisement for prostitution.   MV3 posted pictures of herself in bra and panties and one of her

10

nude bottom that were all provocative. SA Rennison obtained and served a Grand Jury Subpoena to Backpage.com. It was confirmed that MV3's email was used and that the account was created on May 20, 2016. It also displays the photos of MV3 she described.

MV1 said that MV2 took several provocative photos of MV1 and posted them on Backpage using MV3's phone number from the TextNow application. SA Rennison showed MV1 a photograph from Backpage of a female exposing her buttocks and MV1 identified the photo as her. MV1 identified a small scar in the photo as a scar she has on her back. MV1 told SA Rennison and TFO Arizmendi that COPE told them the rates were $100 for a half hour, $150 for one hour, and $200 for two hours.

MV1 said she returned to the Super 8 on the next day, May 21, 2016. MV1 said that COPE and MV2 took MV1 to the Wal-Mart in Lake Jackson to steal hygiene items to clean up after each "lick".

MV1 said that LINCOLN HUSSEY rented a room at Super 8 and took MV1 and MV3 there to "hit some licks". Super 8 did not locate a receipt for a room in HUSSEY'S name for the weekend MV1 is referring to, May 20-21, 2016. but there is a receipt from Super 8 for a room rented by HUSSEY on March 25, 2016.

MV1 told SA Rennison and TFO Arizmendi that COPE would also use the identification card of Kaylynn Janae Baraby to rent rooms at the hotels to keep them out of COPE'S name. MV3 told SA Rennison and TFO Arizmendi that COPE had MV3 use a Texas identification of Kaylynn Baraby that COPE provided to rent a second room on May 20, 20016. COPE also provided MV3 with cash to rent the room. Det. Jimenez obtained a copy of the Guest Folio from Super 8

confirming the information MV3 gave.

After posting ads on Backpage, MV3 began receiving texts and calls from "licks". MV3, MV1 and MV2 told SA Rennison and TFO Arizmendi that when the first lick showed up for MV3, MV3 got scared and could not go through with it. MV1 and MV3 reported to Det. Jimenez that MV1 called COPE on the phone and told COPE they couldn't do it. COPE told them that either MV1 or MV3 better do it or they both would get beat up. MV3 said she began crying and told MV1 she was scared because the guy was real old. MV3 said that MV1 decided she would have sex with the man. MV1 told SA Rennison and TFO Arizmendi that a 36-year-old married man arrived and MV1 had sex with him for $100.

After the first "lick", HUSSEY gave MV1 Xanax and Cocaine and MV1 reported to have blacked out. MV3 said that MV1 bought Xanax bars with some of the money and shared the Xanax with MV3 and MV2. MV1 said that when she woke up, there was a large Mexican man on her having sex with her. MV1 said that HUSSEY, MV2 and ERIC PAGE were in the bathroom while this was going on. MV1 said they came out and PAGE put a gun the Mexican man's head demanding more money. MV3 said that HUSSEY and PAGE were friend's of MORRISON and would act as bodyguards to the girls during the "licks" where they would wait in the bathrooms.   While the man was being robbed, MV1 said she got dressed and ran home.

MV3 told SA Rennison and TFO Arizmendi that MV2 did two "licks" and gave all of the money to COPE. MV1 said that while all of this was going on, MORRISON was walking around the hotel but she never saw him go into the rooms.

Per MORRISON'S cell phone extraction, throughout May 21, 2016, MORRISON was in

constant communication with COPE through iPhone instant messaging. MORRISON messaged COPE asking what they were doing. COPE said that she made MV3 rent COPE her own room and told them not to mess with her unless they got a lick and COPE said she would know because she downloaded their app (TextNow) on her phone. COPE told MORRISON that MV3 was still wanting to make money but COPE was not going to sit in the room with those "underage" females. COPE then tells MORRISON to go fight those "hoes" or she will for MORRISON. MORRISON asked who the females where and COPE told him. MORRISON told COPE that he did not know them but good. COPE then sent MORRISON a picture of MV3 and MV1. The picture was of them standing in a hotel room. COPE goes on to tell MORRISON that MV1 is all about making some money but MV3 is silly and lazy. COPE tells him that MV3 is the only one that is willing to give COPE and MORRISON fifty percent.   MORRISON acknowledges.

In another May 21, 2016, conversation extracted from MORRISON'S phone, MORRISON asks who COPE is with. COPE tells him MV1 and MV3. COPE tells MORRISON that they need another room and the next one that hits a lick will pay for it if that's ok with MORRISON. MORRISON approves and tells COPE they need to hit Austin with all of these "hoes".

COPE told SA Rennison and Det. Jimenez that MORRISON took all of the money COPE made from prostitution. COPE said that MORRISON had three cars purchased with the money from COPE prostituting: a black Chrysler 300, a white Ford Taurus, and a grey Toyota Avalon. On August 16, 2016, TFO Arizmendi observed a black Chrysler 300 and a white Ford Taurus at MORRISON'S residence. MORRISON was arrested on August 26, 2016, in Lake Jackson while driving the same Chrysler 300.

MV3 also told SA Rennison and TFO Arizmendi that COPE gave all of the money made from licks to SKRAP, which is MORRISON'S street name. MV3 said that COPE paid for the rooms and bought food, then gave the rest of the money to MORRISON. On September 27, 2016, MV4 told TFO Arizmendi and SA Rennison that COPE had to give all of the money made from prostitution to MORRISON. MV1 also told SA Rennison and TFO Arizmendi that COPE gave all of the money made from prostitution to MORRISON. MV4 said that COPE could not even keep money to eat. COPE would have to ask MORRISON for food and a ride anywhere she needed to go. MV4 said MORRISON would not pay for COPE's phone to have cell service so she would have to stay at the hotel where she could connect to wifi.

TFO Arizmendi observed a text conversation from MORRISON'S phone extraction between MORRISON and COPE on June 12, 2016. COPE says she is at Super 8 so she has wifi. COPE asks MORRISON to bring her one hundred twenty-dollars ($120) for a room and that she has somebody to put it in their name. COPE tells MORRISON that she is trying to get a room so she can go to work.

MORRISON told MV3 that the prostitution business was "for real" and she could make a lot of money. MORRISON told MV3 that he would take care of her and she could keep half of the money she made.

COPE reported that MORRISON was routinely violent with her when she was not consistent with making money or not making enough money. On September 27, 2016, MV4 told TFO Arizmendi and SA Rennison that MORRISON would hit COPE. MV4 said on one occasion, MV4 and COPE left the Clarion Motel together and MORRISON got mad at COPE because she

14

wasn't at the hotel making money for him. MV4 said when her and COPE returned, MORRISON was waiting on them. MV4 said MORRISON punched COPE in the mouth and busted her lip that later got infected. In a June 4, 2016, text conversation between MORRISON and COPE was COPE tells MORRISON that he treats her like a queen when he is not busting her lip up. On June 5, 2016, COPE asked MORRISON for medicine for her lip because it looked disgusting and people would not pay for her looking like that.

COPE told SA Rennison and Det. Jimenez that MORRISON would drive COPE to her "out-calls". MV2 told SA Rennison and TFO Arizmendi that MORRISON drove MV2 to an "out-call" in Freeport but the "lick" did not show up. MV2 said that COPE rode with them. MV4 also told TFO Arizmendi and SA Rennison that MORRISON would drive COPE to her "out-calls" and would also give MV4 money for gas and food if MV4 would drive COPE.

MV3 said that COPE took her to meet MORRISON in one of the hotel rooms. MORRISON asked MV3 if she remembered him because he used to be friends with MV3's cousin and hangout with him. MV3 did not remember him but felt MORRISON knew her age because he knew her cousin.

TFO Arizmendi observed a message between MORRISON and MV6 on February 24, 2016, when MV6 was seventeen years old. MV6 tells MORRISON that she is no longer in school and was wondering if she worked four hours a day would MORRISON help her out getting a room and she would give him money. MORRISON replied that he was sure they could work something out.

TFO Arizmendi observed text messaging with MV6 from MORRISON'S phone where

MORRISON was asking MV6 where she was at on February 25, 26, 27 and March 30, 2016 asking MV6 where she was. On February 26, MV6 replied at the hotel. MORRISON was also checking up on COPE, aka "MADDY", as he asked MV6 where MADDY was at. MV6 replied that MADDY took MV6's car to go to a $700 lick. MORRISON asked MV6 to have MADDY call him.

On March 30, MORRISON texts MV6 referring to her repeatedly as "BITCH" and tells MV6 that she better have some money for him when she gets back or he is going out there. MV6 tells MORRISON that she doesn't have any money and MORRISON replies that he will see her soon. MV6 tells MORRISON that she doesn't do that anymore and for MORRISON to stop threatening her. MORRISON says he is done talking and for MV6 to have his money or he will see her soon. MV6 says again that she doesn't have any money and that she doesn't do that anymore.

On June 6, 2016, MV6 tells MORRISON that she is going to West Columbia to hit a lick. MORRISON wants to know the address MV6 is going and gets angry when she doesn't know the exact address. MV6 says that she told COPE she was going to hit a lick. MORRISON wanted MV6 to share her location with him, which she did. MORRISON tells MV6 to let him know when she gets back so he can come over. MV6 says that she has a lick in Bay City after the one in West Columbia. MORRISON tells MV6 to come back after the West Columbia lick and he will drive her to the lick in Bay City. MV6 says that the lick in West Columbia backed out and she was on her way back. MV6 then tells MORRIOSON that she is going to the lick in Bay City and sends a screen shot of MV6's text message with the lick.   During the conversation, MORRISON tells MV6 that he is tired of being nice to MV6 because when she comes around

MADDY wants to play and stops making money. After the lick in Bay City, MV6 texts MORRISON that she was on her way back and sent a picture of cash. MORRISON says to meet him and that MV6 owes him $200. MV6 says that she doesn't owe him because she didn't use his room and she used her own car and App (TextNow).

MORRISON sent MV6 a screen shot of a text message between MADDY and MORRISON. The message MORRISON was referring to was MADDY asking MORRISON if MV6 could come work and that MV6 said she would give MADDY $200 from whatever she makes. MV6 tells MORRISON that she forgot.

MORRISON'S iPhone contained a Note created on 3/26/15 that indicated prices for prostitution as $120 for a half hour and $180 for an hour on in-calls and out-calls as $200 for a half hour, $250 for an hour or 15 mins for $80.

MORRISON'S phone also contained a Note that stated "Just because they do dirt with you don't mean they won't snitch on you"

TFO Arizmendi observed a chat between MORRISON and (979) 824-1641 that was saved in MORRISON'S phone as "Macc". In this conversation, MORRISON tells Macc he is in Houston with his "hoes" (prostitutes) working. Based on the conversation, Macc is a pimp also that has mentored MORRISON in being a pimp. Macc goes on to tell MORRISON that he is supposed to be leading his prostitutes. MORRISON identifies his "hoe" as COPE and asks if Macc knows her. MORRISON identifies his location as a hotel off of Main St. and 610 near Kirby. MORRISON says he is with "lil leek" and "big leek". TFO Arizmendi knows "lil leek" to be MALIK BROWN (BROWN).

TFO Arizmendi observed another text message between MORRISON and COPE. According to the conversation, MORRISON tried to run COPE over. COPE proceeds to beg for MORRISON'S forgiveness. It appeared that COPE was with subjects by the name Taylor and Jordyn and there was a confrontation between Taylor and "leek" (BROWN). COPE tells MORRISON that she will fight for him. MORRISON tells COPE, "Well you got 2 bitches to beat up for starters", referring to Taylor and Jordyn. COPE replies that she will kill all those hoes. MORRISON repeatedly refers to COPE as "bitch". At one point, COPE says she has been trying to work with MORRISON all day but he told her to wait until Thursday. COPE indicates that MORRISON told her to tell all the dope heads about bars (Xanax) so she did. At one point, MORRISON says, "Bitch I'm not your nigga fool" and COPE replies, "My pimp bitch". COPE says "That's leek and Taylor, why tf does that have any thing to do with us and our business? Skrap dude your not leavin me with nothin dude."

TFO Arizmendi observed a conversation between MORRISON and EMREE TRIM on MORRISON'S phone. TRIM was in MORRISON'S phone as "BABY" with assigned phone number (281) 979-8283. TRIM asked MORRISON to stop pimping COPE. Not just COPE but all the girls. MORRISON tells TRIM that he can't promise anything. On August 22, 2016, TRIM visited COPE in jail at the Brazoria County Jail. TFO Arizmendi obtained a copy of the audio recording from this visit. COPE explains how there was a girl MV1, MV2 and MV3 and they were with COPE "that night". TRIM says to COPE, "They were like fifteen right?". COPE replies "yeah". COPE says that CHASE HOOBLE went to their room and stole $140 from MV1. COPE said that MV1 walked home from Super 8 and told MV1 mom that COPE and unintelligible were gonna beat MV1.

18

On October 18, 2016, SA Rennison interviewed MV5 (DOB 03/15/1999). MV5 said she began working for MADDY COPE (PATRICIA MADISON COPE) who worked for DEADRIAN MORRISON sometime in early 2016. MV5 was prostituting prior to going to work for COPE. When working for COPE, MV5 gave most of the money to COPE who in turn gave the money to MORRISON. On most nights she worked, MV5 would do four or five licks a night. Another man, MALIK BROWN worked with MORRISON. BROWN would fill in for MORRISON when he was not available. BROWN has driven MV5 to out calls on at least two occasions. COPE wanted MV5 to find other girls to work, so MV5 asked a few girls at school, Isabel LNU, Amber Barron, and Monica Carr. Carr did about three prostitution licks, and Barron never did any. MV5 knew that Jessie MV2, Celeste MV3, and Allyson MV1 worked for COPE and MORRISON. Jordan Lester also worked for COPE and MORRISON.

MORRISON is also known to distribute Xanax to include selling to minors. While reviewing the data extraction from MORRISON'S phone, TFO Arizmendi observed an imessage conversation between Bethany MV6 at 979-481-9923 and MORRISON. On January 1, 2016, MV6 asked MORRISON if he had any "bars". TFO Arizmendi knows the term "bars" to commonly be used in the drug trade when referring to Xanax. MORRISON says he does have some and asks how many MV6 needs. MV6 says she needs three. MV6's date of birth is 05/18/1998 making her seventeen on January 1, 2016 when agreed to sell her Xanax. On October 18, 2016, during an interview with SA Rennison,  Kayla MV5 said she got marijuana and Xanax bars from both MORRISON and BROWN.

COPE told SA Rennison and TFO Arizmendi that BROWN was a friend of MORRISON'S. COPE said that BROWN drove COPE to licks "too many times to count" and would use one of

19

MORRISON'S cars.

## Breach of Plea Agreement

18.   If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant=s plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

## Restitution, Forfeiture, and Fines – Generally

19.   This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he/she will make a full and complete disclosure of all assets over which he/she exercises direct or indirect control, or in which he/she has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he/she has an interest, unless Defendant obtains the prior written permission of the United States.

20.   Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 14 days of signing this plea agreement.  Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the

20

United States to obtain tax information, bank account records, credit histories, and social security information. Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

21.   Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of his/her assets to deliver all funds and records of such assets to the United States.

22.   Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

### Restitution

23.   Defendant agrees to pay full restitution to the victim(s) regardless of the count(s) of conviction. Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victim(s). Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, the restitution order imposed by the Court.

24

### Forfeiture

24. Defendant stipulates and agrees that the property listed in the Indictment's Notice of Forfeiture (and in any supplemental Notices) is subject to forfeiture, and Defendant agrees to the forfeiture of that property.

25. Defendant agrees to waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal or state.

26. Defendant consents to the order of forfeiture becoming final as to Defendant immediately following this guilty plea, pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

27. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge the forfeiture of property in any manner, including by direct appeal or in a collateral proceeding.

### Fines

28. Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge the fine in any manner, including by direct appeal or in a collateral proceeding.

### Complete Agreement

29.   This written plea agreement, consisting of 24 pages, including the attached addendum of Defendant and his/her attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him/her and that he/she is pleading guilty freely and voluntarily because he/she is guilty.

30.   Any modification of this plea agreement must be in writing and signed by all parties.


Filed at _Galveston_, Texas, on _October 4_, 20 1 7.


_X Prahi woon_
Defendant


Subscribed and sworn to before me on _October 4_, 20/7

DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _Susan Strom_____ Deputy United States I

APPROVED:

Abe Martinez
Acting United States Attorney

By: _____
Assistant United States Attorney
Southern District of Texas
Telephone: 713-567-9374

_____
Attorney for Defendant

26

### GALVESTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| | |
| **v.** | **CRIMINAL NO. 3:16-cr-017-1** |
| | |
| **DEADRIAN QUINCY MORRISON,** | |
| **Defendant.** | |

### PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his/her rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant=s decision to enter into this agreement is an informed and voluntary one.

_____       _____
Attorney for Defendant                               Date

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney.   I understand this agreement and I voluntarily agree to its terms.

_____       _____
Defendant                                                   Date

27